IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTA M. MADOCK,

    *Plaintiff,*

  v.

JOHN MCHUGH,
*Secretary of the Army*
    *Defendant.*

Civil Action No.: ELH-10-02706

## MEMORANDUM OPINION

Christa Madock, plaintiff, worked as a "Medical Technologist" for the United States Army Medical Research Institute for Infectious Diseases ("USAMRIID") at Fort Detrick, Maryland, beginning in 1999. Amended Complaint ("Am. Compl.," ECF 27) ¶¶ 5-6. Although Madock was diagnosed with multiple sclerosis ("MS") in July 2000, she continued to work in the same capacity until March 2010, when she transferred to a new position. *Id.* ¶¶ 10-11. The transfer was prompted by a change in the job description for a Medical Technologist, requiring participation in USAMRIID's "Special Immunization Program ("SIP")." Because of her illness, Madock was medically ineligible to participate in SIP, and thus no longer qualified for that position. *Id.* ¶ 27.

In September 2010, plaintiff filed suit in this court, alleging that she was the victim of employment discrimination based on her disability (MS), and that the Army retaliated against her for filing an Equal Employment Opportunity ("EEO") complaint. Her claims are founded on the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 791 *et seq.*[1]

---

[1] This Court has subject matter jurisdiction based on 28 U.S.C. § 1331.

Defendant has filed a Motion To Dismiss, or in the Alternative, for Summary Judgment ("Motion," ECF 10), which plaintiff opposes.[2]  *See* Brief of Plaintiff Christa Madock Opposing Motion to Dismiss or for Summary Judgment ("Opp'n" or "Opposition," ECF 19).  The parties have filed numerous exhibits to support their respective positions.  In particular, defendant submitted over 800 pages of exhibits, and the Appendix attached to plaintiff's Opposition consists of 657 pages.  Many of the exhibits derive from plaintiff's EEO complaint, which led to an evidentiary hearing.[3]  The issues have been fully briefed and the Court rules now pursuant to Local Rule 105.6, no hearing being necessary.

### Factual and Procedural Background[4]

---

[2] In her Complaint, plaintiff alleged constructive discharge.  ECF 1.  By Order entered on June 29, 2011 (ECF 26), the Court granted leave to amend the suit to add a claim of actual discharge.  By that point, however, defendant's Motion had been fully briefed.  On July 14, 2011, defendant filed a Supplement (Deft. Supp., ECF 28), primarily to address plaintiff's new averment.  Plaintiff responded on July 21, 2011 ("Pl. Supp.," ECF 30), and defendant filed a reply on August 8, 2011 (Deft. Supp. Reply, ECF 31).

In her Supplement, plaintiff urges the Court to strike Defendant's Supplement, claiming it is an impermissible surreply, in violation of Local Rule 105.2.a.  Pl. Supp. 4.  However, plaintiff's Amended Complaint, filed after the Motion was ripe, raised a new theory of relief, i.e., actual discharge.  To the extent that the parties' submissions can be characterized as surreplies, the Court shall, in its discretion, allow them.

[3] As discussed, *infra*, plaintiff filed a Formal Complaint of Discrimination with the EEO Office.  Thereafter, the Department of Defense Investigations and Resolutions Division conducted an administrative investigation that included a two-day "Fact Finding Conference," held in April 2010, at which testimony was presented, under oath.  *See generally* Motion Exh. 1 (transcript entitled "Department of Defense Investigations and Resolutions Division, Investigation in the Complaint of Christa Madock, Agency Docket No. ARDETRICK09JUL03769:  Fact Finding Conference"). All testimony referenced herein was presented at the Fact Finding Conference.

[4] The Court must construe the facts alleged in the light most favorable to plaintiff, as the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).  The facts have many twists and turns, and are not presented in chronological order.  Rather, they are grouped topically, when possible.

In May 1999, plaintiff obtained a "contingent position" as a "Medical Technologist" in the "Clinical Lab" of USAMRIID. Am. Compl. ¶¶ 5-6. She became a permanent employee in April 2004. *Id.* ¶ 13. Her duties included, *inter alia*, "performing and supervising testing on human and animal blood, urine, and other bodily fluids and tissues." Memorandum in Support of Motion to Dismiss, or in the Alternative, for Summary Judgment ("Motion Memo.," ECF 10-1) 3; *see* Motion Exh. 2 ("Position Description" of Medical Technologist, dated June 7, 1998). Plaintiff also acted as a "chemistry supervisor," ensuring that the Clinical Lab met the relevant regulations and maintained its certifications and licenses. Motion Memo. 3; *see* Motion Exh. 1, at 153. In addition, she was the "Laboratory Information System administrator" for the Clinical Lab's computer system (the "LIS"). Motion Exh. 1, at 20-21.

The Clinical Lab supports research on disease agents that pose "limited risk," as well as "research involving more dangerous and exotic infectious diseases." Motion Memo. 4 (citing Motion Exh. 1, at 176). For instance, the Clinical Lab supports research "on potentially lethal communicable diseases for which there are vaccines or treatments," which rate a "Biosafety Level" of 3. *Id.* When plaintiff was hired, Clinical Lab employees working with Biosafety Level 3 substances were required to enroll in a "Special Immunization Program," consisting of "a regimen of vaccinations that [takes] approximately eight months to complete." *Id.*; *see* Motion Exh. 1, at 178; *see also* Am. Compl. ¶ 7.

In addition, the Clinical Lab supports "research on dangerous and exotic agents that pose a high risk of life-threatening disease and for which there is no available vaccine or therapy," which rate a "Biosafety Level" of 4. Motion Memo. 4; *see* Motion Exh. 1, at 176. Employees working with "Biosafety Level" 4 substances must work in high containment laboratories,

Motion Memo. 1; Motion Exh. 1, at 153, in which they wear a protective "blue suit" that is tethered to a separate supply of oxygen. Motion Exh. 1, at 176-77. The Clinical Lab also operates a two-bed intensive care unit ("ICU") in the event that a researcher is exposed to a dangerous substance and needs to be quarantined. *Id.* at 177-78. Given the risks inherent in exposure to dangerous organisms, employees supporting the ICU must also wear the "blue suit," participate in the SIP, and enroll in the Army's Biological Personnel Reliability Program ("BPRP").[5] Motion Memo. 4; *see* Motion Exh. 1, at 173 (Major Jorgensen, plaintiff's supervisor, testified: "[W]e would be required at the clinical laboratory to operate a biosafety level four clinical lab in supporting a patient.").

When plaintiff was hired in May 1999, her job description did not require her to participate in SIP. Am. Compl. ¶¶ 6, 8; *see* Motion Exh. 2. However, she "wanted to expand [her] training and . . . knowledge to work in [Biosafety Level 3] and [Biosafety Level 4] laboratories." Motion Exh. 1, at 73. To that end, "shortly after" plaintiff was hired, she spoke with Dr. Ellen Boudreau, then the SIP Supervisor, about participating in SIP. *Id.* At that time, plaintiff was pregnant with her second child. *Id.* Dr. Boudreau informed plaintiff that because plaintiff intended to breastfeed, she could not participate in SIP. *Id.* However, Dr. Boudreau indicated that after plaintiff finished breastfeeding, she would be able to participate in SIP, although it "was not required" for the position. *Id.* at 74.

---

[5] "The BPRP . . . requires the employee to submit to and satisfactorily complete suitability and reliability screening and analysis." Motion Exh. 19. Employees enrolled in BPRP must also be approved by the Department of Health and Human Services and the Department of Justice in order to "access . . . laboratories containing biological select agents and toxins." *Id.*

In July 2000, plaintiff was diagnosed with MS. Am. Compl. ¶ 10. Dr. Boudreau subsequently advised plaintiff that she could not participate in SIP because of her medical condition. *Id.*; *see* Motion Exh. 1, at 26 (Plaintiff testified: "Dr. Boudreau informed me back in 2000 that because of my MS, I could not participate in SIP because of the way that the vaccines may affect the disease process of MS."). When plaintiff later became a permanent employee in April 2004, she was not required to participate in SIP. Am. Compl. ¶¶ 12, 13.

Plaintiff testified that her MS limits her ability to walk, affects her balance, and diminishes her endurance, particularly when she is under stress, such that she may only stand for an hour or two at a time. Motion Exh. 1, at 12-13. Plaintiff also uses a crutch to assist her in walking. *Id.* at 13. Despite her medical condition, however, plaintiff "continued to perform her duties and to get good performance appraisals without participating in SIP." Am. Compl. ¶ 11.

*Reasonable Accommodations*

Major Shelley Jorgensen joined the Clinical Lab as a supervisor in September 2008. Motion Exh. 1, at 11, 115. Colonel Sherman McCall became Major Jorgensen's supervisor "a few months later." *Id.* at 117. According to plaintiff, "shortly" after Major Jorgensen's arrival, plaintiff "made a point of going to [Major Jorgensen's] office" to inform Major Jorgensen of her MS.[6] *Id.* at 17-18.

As the new lab supervisor, Major Jorgensen was of the view that the Clinical Lab lacked sufficient medical technologists eligible to work in high containment laboratories. *Id.* at 156-57, 166. She also thought the lab was not prepared for an accidental exposure, and was concerned because responsibility for supporting the ICU and high containment research fell on one

---

[6] The record reflects that plaintiff had also notified her previous supervisor. *See* Motion Exh. 1, at 17.

employee. *See id.* at 156-57, 173-74. Nevertheless, Major Jorgensen assisted in providing accommodations to plaintiff necessitated by her medical condition. In a Memorandum for Record sent in April 2009,[7] from Major Jorgensen to plaintiff, Jorgensen addressed two incidents in which plaintiff had fallen while working, as well as reasonable accommodations available to her. *See* Motion Exh. 3. The Memorandum, which plaintiff signed on April 8, 2009, acknowledging receipt, said, in part, *id.*:

> 4. You [Ms. Madock] have expressed to me your desire to move to a more administrative position at a future date. I approached the topic with you a week later to inform you that I would be willing to discuss this issue with the Human Resources Department to see what options were available to accommodate this request. You stated that you wanted to first get our laboratory through the College of American Pathologist's (CAP) inspection and would be interested in exploring options for a position move at a future date.

> 5. I am willing to make reasonable accommodations for you as necessary to ensure you have a safe work environment. You have been provided a scooter from USAMRIID to get to your office from the security desk. We have also installed handicap accessible push buttons at both areas of the entrance/egress at the laboratory entrance and chemistry department. I have agreed to have your work area assessed by medical professionals at your request . . . .

In addition, on April 7, 2009, plaintiff asked Major Jorgensen "to be removed from phlebotomy duties due to excessive standing." This request was granted, and plaintiff was "put on administrative logging in of patients when . . . needed in the front room," which allowed her to be seated. Motion Exh. 6, at 3, 5; *see also* Motion Exh. 1, at 163. On April 20, 2009, plaintiff submitted a Reasonable Accommodation Request Form, which acknowledged that she had been provided a scooter; an hour on Tuesday and Thursday afternoons for physical therapy; and work-related tasks that allowed for "variability of sitting, standing, and walking." Motion Exh. 6, at 1.

---

[7] The typewritten date on the Memorandum is April 3, 2009, but the handwritten date next to Major Jorgensen's signature is April 7, 2009.

The form also noted that Major Jorgensen would "put in a work order to place handrails down the hallway to allow better mobility when walking." *Id.* at 3.

### *The Referral to the Employee Assistance Program*[8]

In early April 2009, Major Jorgensen found plaintiff crying while sitting at Jorgensen's computer. Motion Exh. 1, at 120. According to Major Jorgensen, plaintiff reported that plaintiff's bank account had been emptied, "maybe" by her husband, who suffered from a "drinking problem." *Id.* at 121. Jorgensen gave plaintiff "some time off at lunch" to attend to her affairs. *Id.* at 122.

On April 7, 2009, USAMRIID held suicide awareness training. *Id.* Major Jorgensen attended the training with plaintiff. *Id.* During a movie, which Major Jorgensen later described as "sad," she observed that plaintiff was crying. *Id.* The next day, April 8, 2009, Major Jorgensen and Colonel McCall talked to Brad Nielson of the EAP office, who said that it was incumbent upon them, as management, to ascertain whether an employee is suicidal. *Id.* at 123. Later that day, Colonel McCall and Major Jorgensen met with plaintiff. *Id.* Colonel McCall allegedly informed plaintiff that "he believed she was at risk for suicide," and "advised her to seek counseling." Am. Compl. ¶¶ 16-17. Plaintiff declined to do so. *Id.* ¶ 18. Jorgensen and McCall also gave plaintiff a Memorandum for Record, documenting their concerns. *See* Motion Exh. 7. It noted, in part: "You seem stressed and overwhelmed at work and this has manifested itself in the form of outbursts, crying, problems task organizing and meeting deadlines." *Id.*

_____

[8] "The U.S. Army Employee Assistance Program . . . provides confidential, appropriate and timely problem-assessment services, as well as referral and follow-up services to health care providers when appropriate. . . . EAP is available for those seeking help with life management issues, emotional problems, behavioral health issues and job related problems that affect job performance." Motion Memo. 9 n.1 (quoting http://www.detrick.army.mil/asap/eap.cfm).

Plaintiff refused to sign the Memorandum, however. Motion Exh. 1, at 80. According to plaintiff, after she declined EAP counseling, Colonel McCall "became distant and curt to her." Opp'n 4 (citing Opp'n App'x 3).

At the Fact Finding Conference held with respect to plaintiff's EEO complaint, plaintiff testified that she was "humiliated and upset" by the meeting concerning the EAP. Motion Exh. 1, at 67. Colonel McCall testified that he would have been "grossly negligent" had he not asked plaintiff whether she felt suicidal. *Id.* at 239. He explained that it was his responsibility, "as a physician and as a supervisor," to consider the possibility, but maintained that when plaintiff denied feeling suicidal, he and Jorgensen "let it drop." *Id.* He elaborated, *id*:

> [Plaintiff] might be at risk for suicide. . . . MS patients have over a two percent lifetime risk of suicides, over twice the population risk.
>
> On top of that, she's had a lot of life events, to our understanding, in terms of financial problems and family problems and job problems last year that in various studies have been found to be associated with between a fifth and a third of suicides.

On July 28 2009, plaintiff contacted the EEO office, complaining of a "hostile work environment." *See* Motion Exh. 9. She claimed it "first started" at the time of the EAP referral involving Major Jorgensen and Colonel McCall.[9] *Id.*; *see* Motion Memo. 11.

*Plaintiff's Performance Appraisal*

Plaintiff avers: "Performance at USAMRIID [is] graded A, B, C, F. 'A' was the highest grade. 'F' was failing." Am. Compl. ¶ 19. Each employee has both a "rater" and a "senior rater," who jointly determine an employee's rating, based on weighted components that total

---

[9] Plaintiff testified that she asked the EEO office to wait on the filing of her formal complaint, "until after [her] performance appraisal." Motion Exh. 1, at 91-92. The EEO complaint, discussed *infra*, was filed on November 1, 2009.

100.  A rating between 85 – 100 scores an "A"; a rating between 70 – 84 scores a "B"; a rating

between 50 – 69 amounts to a "C"; and a score below 49 is an "F."  Until 2009, plaintiff, with

one exception, had always earned an "A."[10]  The performance appraisal form also has a section

for management to note changes to an employee's base pay and a bonus.  Prior to the 2008-2009

performance period, with one exception, the performance appraisals did not reflect any change in

plaintiff's base pay, nor was there any indication that plaintiff ever received a bonus.

As noted, the Clinical Lab underwent a change in leadership beginning with the 2008 –

2009 period, when Major Jorgensen and Colonel McCall became supervisors of the Clinical Lab.

During this period, Jorgensen and McCall were plaintiff's rater and senior rater, respectively.

Motion Exh. 1, at 202.

---

[10] Plaintiff's ratings at USAMRIID, leading up to the 2008 to 2009 period, were as follows:

- 1999 – 2000 (rater:  Captain Cheryl Moore, senior rater:  Colonel Arthur Anderson): "A," 84/100 (45/50 technical competence).  *No change in pay noted.*  Opp'n App'x 31.
- 2000 – 2001 (rater:  Captain Cheryl Moore, senior rater:  Colonel Arthur Anderson): "A," 90/100 (45/50 technical competence).  *No change in pay noted. Id.* at 30.
- 2001 – 2002 (rater:  Captain Tenaya Gilman, senior rater:  Colonel Arthur Anderson): "A," 86/100 (47/50 technical competence).  *No change in pay noted. Id.* at 29.
- 2002 – 2003 (rater:  Captain Tenaya Gilman, senior rater:  Colonel Arthur Anderson): "B," 84/100 (45/50 technical competence).  *No change in pay noted. Id.* at 28.
- 2003 – 2004 (rater:  Captain Tenaya Gilman, senior rater:  Colonel Arthur Anderson): "A," 87/100 (45/50 technical competence).  *Plaintiff received a base pay increase. Id.* at 27.
- 2004 – 2005 (rater:  Captain Jeffrey Brown, senior rater:  Colonel Phillip Pittman):  "A," 95/100 (50/50 technical competence).  *No change in pay noted. Id.* at 26.
- 2005 – 2006 (rater:  Captain Jeffrey Brown, senior rater:  Colonel Phillip Pittman):  "A," 90/100 (47/50 technical competence).  *No change in pay noted. Id.* at 25.
- 2006 – 2007 (rater:  Captain Dianne Wilson, senior rater:  Colonel Phillip Pittman):  "A," 93/100 (48/50 technical competence).  *No change in pay noted. Id.* at 24.
- 2007 – 2008 (rater:  Captain Dianne Kittrell, senior rater:  Colonel Phillip Pittman):  "A," 95/100 (49/50 technical competence).  *No change in pay noted. Id.* at 23.

On June 30, 2009, Major Jorgensen met with Colonel McCall regarding plaintiff's upcoming 2008 – 2009 performance appraisal. *Id.* at 201. According to Major Jorgensen, Colonel McCall "was actually pretty adamant that he wanted to give [plaintiff] a failing grade. He wanted to give her an F," based on her "working relationships, communication problems, passive-aggressive behavior," and the "LIS system not meeting his standards." *Id.* at 201-03. Major Jorgensen further testified that both she and Colonel McCall had noticed a "progression" in plaintiff's MS and, at the meeting of June 30, 2009, Colonel McCall indicated that "he felt that [plaintiff's] MS had progressed to a cognitive dysfunction disorder." *Id.* at 203-04.

Colonel McCall testified that, "at various times after various incidents," both he and Major Jorgensen wanted to give plaintiff an "F." *Id.* at 287. He admitted that they discussed plaintiff's MS, but claimed it was in the context of her deteriorating job performance. *Id.* at 288. The following testimony from the Fact Finding Conference is relevant, *id.* at 287-92:

> [PLAINTIFF'S COUNSEL]: Did you discuss that Ms. Madock might have or probably had intermittent explosive disorder?
>
> [COLONEL MCCALL]: I don't recall. I might have.
>
> [PLAINTIFF'S COUNSEL]: Did you discuss with [Major Jorgensen] in connection with giving [plaintiff] a rating of F that she was suffering from MS cognitive dysfunction[?]
>
> [COLONEL MCCALL]: We were concerned about the apparent deterioration of job performance . . . [T]here was a slippage. An inability to meet deadlines, failure to get [Standard Operating Procedures] revised, failure to certify tests in the LIS, leaving for a four-day holiday, all kinds of things. And we theorized what -- and a lot of these observations were coming from Major Jorgensen. [Plaintiff] appears to be disorganized. Her desk is a mess. She's not getting me the QA on time, on and on. And again, you keep wanting to give her the benefit of the doubt. She just doesn't care or what is it?

But again, if it were -- anyone that did the same things would have had the same problem as far as an evaluation was concerned. In that sense, the disease was irrelevant.

[PLAINTIFF'S COUNSEL]: . . . Did you say to Major Jorgensen that Christa Madock's MS cognitive dysfunction was a reason to give her an F?

[COLONEL MCCALL]: No.

* * *

[PLAINTIFF'S COUNSEL]: . . . [D]id you say to Major Jorgensen that Ms. Madock's MS cognitive dysfunction was causing problems with her performance, in sum and substance?

[COLONEL MCCALL]: I probably raised it as a possibility. I didn't say that was the case. It's a speculation. I'm not her doctor.

Also on June 30, 2009, Major Jorgensen met with plaintiff about her upcoming performance appraisal. Am. Compl. ¶ 19. Jorgensen allegedly informed Ms. Madock that her performance rating would be "no less than a 'B.'" *Id.* ¶ 20.[11] They also discussed plaintiff's interpersonal relationships. Motion Exh. 1, at 86 (Plaintiff testified about the meeting, stating: "[W]e discussed how well I had done. [Jorgensen] again said that my technical competency was very good. My interpersonal relationships were not so good and that I needed to work on that. I agreed with [Major Jorgensen] that I sometimes have difficulty with interpersonal relationships.").

However, after another meeting,[12] Major Jorgensen and Colonel McCall compromised on giving plaintiff a rating of "C," or "Successful." Opp'n App'x 39; *see* Am. Compl. ¶ 21 ("Some time between the June 30, 2009 meeting and [August 4, 2009, the date of plaintiff's performance

---

[11] Although not material, Major Jorgensen testified that she "never promised [plaintiff] a B rating." Motion Exh. 1, at 144. She claimed only to have promised to notify plaintiff, in writing, if her rating was lower than a B. *Id.*

[12] I could not locate the date of this meeting in the record.

appraisal] MAJ Jorgensen met with COL McCall to discuss Ms. Madock.").  On August 4, 2009, plaintiff received her performance appraisal, a "C" score of 55/100, and a Memorandum for Record ("Performance Memorandum") authored by Jorgensen, dated August 4, 2009.  *See* Motion Exh. 10; Opp'n App'x 39.[13]  The Performance Memorandum stated, in part:

> I am deeply concerned about [your] duty performance issues and I need to inform you that fraudulent reporting . . ., insubordination, passive-aggressive behavior, and creating a hostile work environment will not be tolerated in this laboratory.  I am also concerned about your organizational skills and inabilities to task organize projects and have them completed in a timely manner.

Further, the Performance Memorandum said:  "Any future misconduct may result in more severe disciplinary action that could lead to removal."  *Id.*

In a Memorandum for Record dated August 10, 2009, plaintiff responded to the Performance Memorandum.  Motion Exh. 12.  She disputed several of the allegations ("There are no allegations of insubordination"; "I do my best to respond to you and others politely"; "I have been on time [with quality assurance] since April"), but admitted to others ("[M]y submission of [a survey] with [Major Jorgensen's] name on it was an error, not fraud"; "If you mean raising my voice . . ., I regret those incidents"; "I apologized to SPC [Shanele] Moore for

---

[13] The Performance Memorandum (Motion Exh. 10) cited the following concerns:

- Technical competence:  plaintiff was strictly controlling the LIS and not providing training to others; she failed to meet quality control deadlines; and she was disorganized in managing her workflow and easily overwhelmed.

- Working relationships:  plaintiff raised her voice at two quality control meetings (March 6 and April 1, 2009); on April 14, 2009, she used profanity in a verbal altercation with another Clinical Lab employee, Shanele Moore; plaintiff intended to disclose information during an inspection that would have discredited the Clinical Lab; and she reported a perceived non-compliance to an outside inspector without first informing management.

- Communications:  plaintiff electronically signed Major Jorgensen's name as having "reviewed" a survey, without Major Jorgensen's permission; and she exceeded the normal turnaround time period for certain projects.

my harsh remark . . . . I regret having spoken inappropriately"[14]).  *Id.*  Then, on August 19, 2009,

plaintiff submitted a Request for Reconsideration of her performance appraisal.  Motion Exh. 14.

By memorandum dated September 8, 2009, Major Jorgensen declined to change plaintiff's rating

of "C."  Motion Exh. 15.  In accordance with applicable procedure,[15] on September 23, 2009,

plaintiff appealed that denial to Colonel McCall.  Motion Exh. 16.

On November 20, 2009, via a "special" performance appraisal, Jorgensen and McCall

gave plaintiff a "B," in which plaintiff scored a total of 71 out of a possible 100.  Opp'n App'x

75.  Then, by memorandum dated November 25, 2009, McCall informed plaintiff that the Judge

Advocate General ("JAG") had instructed him[16] that no further administrative action would be

---

[14] This remark refers to an altercation between plaintiff and Specialist Moore, another employee at the Clinical Lab.  A microbiologist at the lab, Edward Selby, wrote a Memorandum for Record memorializing this incident.  Motion Exh. 8.  He stated, *id.*:

> There was a brief conversation at the doorway [of the room he and plaintiff were in] between [Specialist] Moore and Christa which I did not pay attention to. I . . . heard Christa say that she had to retrieve something out of the filing cabinet which was located behind the door.  She had to shut the door to access the cabinet.  When she shut the door she gave it a little extra push and was clearly frustrated.  She then said that "I would not have to be doing this if she did her f***ing job.  A few minutes later . . . Moore appeared again at the doorway and informed me that she was in the doorway the entire time and did not appreciate the door being slammed on her or what Christa had said.

[15] The procedure for Requests for Reconsideration is set forth in "Policy 11," entitled the Laboratory Personnel management Demonstration Project Reconsideration Process, discussed *infra*.  *See* Opp'n App'x 157.

[16] At the Fact Finding Conference, Colonel McCall testified that he had not been told directly by JAG, but rather, "the instruction came via the personnel department," i.e., Ms. Merriman.  Motion Exh. 1, at 293.  Ms. Merriman later indicated that suspending the reconsideration process in light of an EEO complaint was "the way it's supposed to go."  *Id.* at 464.  She testified:  "JAG, Mr. Jeff Miller, sent me an e-mail, which I believe I forwarded [to Colonel McCall], saying we need to cease and desist the reconsideration route because it's part of the EEO complaint.  But if she had not made it part of EEO, we would have gone on with the reconsideration process."  *Id.* at 462-63.

taken "via the PDP administrative reconsideration process on [her] appeal, since it [had since become] the subject of a formal EEO complaint." Motion Exh. 17.

*The Change in Plaintiff's Position Description*

As noted, Major Jorgensen was concerned about the Clinical Lab's ability to support high containment (i.e., Biosafety Level 4) research. Motion Exh. 1, at 156-57. She was concerned because only one out of the four civilians working at the Clinical Lab was qualified to work in the ICU, which she regarded as an unfair burden on that individual. *Id.* at 173-74. She also testified that two of the Medical Technologists, plaintiff and Linda Hildebrand, had different job descriptions. *Id.* at 154-55. In particular, Hildebrand was required to participate in SIP, while plaintiff was not. *Id.* at 155; *see id.* at 678-79 (Hildebrand testified: "[SIP] was always in my job description."). Major Jorgensen sought to remedy these matters by requiring all four civilian employees to enroll both in SIP and in BPRP. *Id.* at 158. By e-mail, she notified the employees of the change in position description. *Id.* at 209. Jorgensen maintained that her decision "did not have to do with anybody's disability." *Id.* at 159. Rather, she claimed that the decision was based "solely on mission need." *Id.*

On August 6, 2009, plaintiff received an e-mail from Major Jorgensen stating that, effective September 4, 2009, the Medical Technologist job description would require participation in SIP. Motion Exh. 18. On August 19, 2009, plaintiff submitted a Reasonable Accommodation Request, seeking to "be accommodated by taking on duties from the other three [civilian employees] who could be vaccinated." Motion Exh. 21, at 2; Motion Exh. 1, at 25 (plaintiff testified that she requested that she "not be required to perform -- or to participate in SIP, and therefore, not also work in the biocontainment suites BL3 and BL4"). By

- 14 -

Memorandum for Record dated September 10, 2009, Jorgensen told plaintiff to obtain an updated "Certificate of Medical Examination," Opp'n App'x 61, which she did on September 25, 2009. The examining physician confirmed that plaintiff was unable to participate in SIP. Motion Exh. 20.

On November 1, 2009, plaintiff filed a Formal Complaint of Discrimination with the EEO Office, alleging on the form that she had been discriminated against because of her "physical disability," which she identified as MS. Motion Exh. 24. She complained, *inter alia*, about the change in her position description, the Performance Memorandum, and the referral to the EAP, which she believed were part of Major Jorgensen and Colonel McCall's "campaign to force [her] out of [her] position." *Id.* at 2.[17]

By memorandum dated November 16, 2009, Major Jorgensen wrote to plaintiff, stating: "[Y]ou do not meet the medical requirements of this position. Specifically, you cannot participate in SIP and you cannot wear BSL4 personal protective equipment (PPE) which is mission essential to performing the duties of this position." Opp'n App'x 70. Also by memorandum dated November 16, 2009, Major Jorgensen denied plaintiff's Reasonable Accommodation Request, stating: "I am denying your request due to the fact that this is a mission essential requirement. . . . [Y]ou may be offered an alternate Reasonable Accommodation in the form of a Reassignment." *Id.* at 72.

The position description change meant, in effect, that plaintiff no longer met the requirements for her job position. Motion Memo. 13. Plaintiff testified: "I was [able to perform the essential functions of a Medical Technologist], until the change in my position description."

---

[17] On August 19, 2009, plaintiff added allegations to her EEO complaint, although it had not yet been filed. *See* Motion Exh. 9.

Motion Exh. 1, at 20. Notably, Plaintiff conceded that all of the civilian employees were treated equally with regard to the SIP requirement. She testified: "In relation [t]o the SIP, I would say no, no one was treated differently." *Id.* at 269.

*Plaintiff's Reassignment*

On December 2, 2009, plaintiff met with Jennifer Merriman, Chief of the Human Resources Office at USAMRIID, regarding her Reasonable Accommodation Request of August 19, 2009, which Major Jorgensen had denied on November 16, 2009. Motion Memo. 14; *see* Motion Exh. 22. According to a Memorandum of Record dated December 3, 2009, authored by Ms. Merriman and signed by plaintiff, the two discussed whether plaintiff was "willing to be reassigned to a vacant position." Motion Exh. 22, at 1. Plaintiff responded that she was, provided that she was allowed to evaluate available positions. *Id.*

Plaintiff established the following criteria for the positions she was willing to consider: (1) she would not take a pay cut (i.e., the position had to be within her current grade and pay band); (2) the position would not require sitting or standing for more than two hours at a time; (3) preferably, the job would not be located more than ten miles from Frederick, MD (the Fort Detrick area) or forty miles from her residence (Smithsburg, Maryland); and (4) she would be willing to accept a hospital lab position as long as it involved "administrative type lab work." *Id.* at 1-2. Ms. Merriman testified that members of her office, as well as plaintiff, searched for jobs for plaintiff that fit the criteria set by plaintiff. Motion Exh. 1, at 469. Further, she testified that she and plaintiff had "weekly" conversations about the job search. *Id.* at 473. Ms. Merriman opined that she and her staff went "out of [their] way" to accommodate plaintiff. *Id.* at 470.

In a letter dated December 9, 2009, Jeffrey Miller, an "Agency Labor Counselor" with JAG, wrote to plaintiff's counsel regarding plaintiff's Reasonable Accommodation Request and the ongoing search for a suitable reassignment position (the "Miller letter"). Opp'n App'x 79. He stated, *id.* (emphasis added):

> Management is looking for possible jobs that would meet your client's criteria and which she would qualify for consideration.
>
> Management has expressed concern to me that your client may not be aware that if they cannot find such a job within these parameters, that could trigger processing of a possible proposal to remove her from her position due to inability to perform critical elements of her current position. *No such proposed removal has taken place at this point, but it is a possibility.*

By letter dated January 12, 2010, plaintiff's counsel wrote to Angela V. Anderson, whom he believed was investigating plaintiff's EEO complaint, and copied Miller on the letter. Opp'n App'x 169-73. The letter stated, in part, *id.*:

> Mr. Miller's . . . statements [referring to the "possibility" of her "removal" because of her "inability to perform critical elements" of her position] threaten to terminate Ms. Madock from her position in January 2010 unless she finds another job. Termination in this economic environment would leave Ms. Madock without the means to support her family.
>
> \* \* \*
>
> . . . Each time the Army makes the situation worse by setting termination deadlines or blocking job search attempts it adds to Ms. Madock's damages, including emotional distress damages. Please consider whether the Army might be better served by putting Ms. Madock's "B" performance appraisal in effect and by keeping her in the job she does well until this matter can be resolved.

Ms. Merriman testified that she personally contacted a lab at Fort Detrick to locate the position that plaintiff ultimately accepted. Motion Exh. 1, at 469-70. Effective March 28, 2010, plaintiff was reassigned to the position of "Quality Assurance Scientist" at the U.S. Army

Medical Materiel Development Activity.[18]  Motion Exh. 23.  Notably, the position has the same

salary, grade/level, and pay band as plaintiff's prior position with USAMRIID.  *See id.*

*The Administrative Investigation*

As noted, plaintiff filed her formal EEO complaint on November 1, 2009.  Thereafter, the

Department of Defense Investigations and Resolutions Division conducted an administrative

investigation of the complaint, which included a two-day Fact Finding Conference.  *See

generally* Motion Exh. 1.  The investigator received evidence and sworn testimony from fifteen

witnesses, including plaintiff. [19]  Through counsel, plaintiff had the opportunity to question all of

the witnesses and to present evidence and arguments.  The investigator issued her Report of

Investigation on June 4, 2010, in which she found in favor of the employer with respect to

plaintiff's performance rating; position description change; and referral to the EAP.  *See

generally* Motion Exh. 25.  On August 31, 2010, the Army issued a final decision with respect to

plaintiff's EEO complaint, finding that plaintiff was not the victim of discrimination based on

her disability.  Motion Exh. 26, at 14.

This suit followed.  Although plaintiff's Amended Complaint does not contain separate

"Counts," *see* FED. R. CIV. P. 10(b) ("If doing so would promote clarity, each claim founded on a

separate transaction or occurrence . . . must be stated in a separate count or defense."), the

parties' submissions have made clear that plaintiff asserts two claims under the Rehabilitation

Act, 29 U.S.C. § 791 *et seq.*:  (1) multiple acts of discrimination because of her MS, including a

change in plaintiff's job description that she avers culminated in her actual or constructive

---

[18] In her Declaration, dated March 9, 2011, plaintiff avers that she had to apply for that position, which she believed was open to other candidates.  Opp'n App'x 7.

[19] Major Jorgensen, who was in Iraq, was interviewed telephonically.

discharge, and (2) retaliation for the filing of plaintiff's EEO complaint, manifested by the failure to consider plaintiff's administrative appeal of her performance review. [20]

Additional facts will be included in the discussion, as relevant.

## Discussion

### I.

As indicated, defendant has moved to dismiss or, in the alternative, for summary judgment. When deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court considers the complaint, as well as documents attached to it. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("We may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic . . . ." (citation omitted)). FED. R. CIV. P. 12(d) provides that, if "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

The Court is mindful that this case is in the early stage of litigation. Ordinarily, summary judgment is inappropriate if "the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the

---

[20] As will be discussed in more detail, *infra*, plaintiff claims that the EAP referral and her negative performance review constituted discrimination, and that the change in her position description constituted constructive or actual discharge from employment.

grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)). Failure to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Evans*, 80 F.3d at 961. *But see Harrods Ltd.*, 302 F.3d at 244 ("[I]n some cases courts have held that summary judgment was premature even when the opposing party failed to file a [Rule 56(d)] affidavit.").

Notably, "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery." *Young v. UPS*, No. DKC-08-2586, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011); *see Merchant v. Prince George's Cnty. Md.*, No. 10-1268, 2011 U.S. App. LEXIS 12574, at *3 (4th Cir. June 21, 2011) (unpublished) ("[N]onspecific requests for discovery in [an] opposition memorandum did not serve as a 'functional equivalent' of a Rule 56(d) affidavit . . . ."); *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (noting that the non-movant "'may not simply assert in its brief that discovery was necessary'" (citation omitted)). The affidavit must explain why, "for specified reasons, [the non-movant] cannot present facts essential to justify its opposition," unless needed discovery is permitted. Fed. R. Civ. P. 56(d). So, "to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, No. JFM-09-3110, 2011 U.S. Dist. LEXIS 61044, at *11 (D. Md. June 7, 2011) (alteration in original) (citation omitted). *See generally Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Moreover, even if a Rule 56(d) request for additional discovery has been made, it is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006) ("A Rule 56[(d)] motion for additional discovery is properly denied when the additional evidence sought to be discovered would not create a genuine issue of material fact sufficient to defeat summary judgment."); *see also Young*, 2011 U.S. Dist. LEXIS 14266, at *63 (plaintiff's Rule 56(d) request "must be denied, as the additional requested discovery would not create a genuine dispute of fact sufficient to defeat summary judgment").

Plaintiff's counsel has submitted a Rule 56 affidavit. Opp'n App'x 99-102.[21] He contends that additional discovery is needed, largely to explore the thought processes and rationale with respect to the conduct of Major Jorgensen and Colonel McCall. *Id.* at 101. Plaintiff's attorney also seeks information about the meetings between Jorgensen and McCall, as well as the "sum and substance of COL McCall's discussion with JAG about Ms. Madock's request for reconsideration of the 'C' performance appraisal." *Id.* In addition, he seeks information about the chain of command at the U.S. Army Medical Materiel Development Activity and USAMRIID, and information relative to the reassignment process. *Id.* at 102.

Plaintiff's discovery request seems to overlook the voluminous record in this case, spawned by the administrative proceedings concerning plaintiff's EEO complaint. Indeed, the parties have collectively submitted about 1500 pages of exhibits, including testimony from the central participants, all of whom were questioned by plaintiff's counsel, under oath. The

---

[21] The affidavit refers to Rule 56(f), the former iteration of Rule 56(d).

transcript of the fact-finding conference alone amounts to 715 pages. There is, quite simply, a "'wealth of information . . . already available to the court.'"[22] *Amirmokri*, 437 F. Supp. 2d at 420 (citation omitted).

Moreover, the evidence that plaintiff's counsel now seeks to discover will not create a genuine issue of material fact. Most of the discovery sought by plaintiff's counsel concerns his suggestion that the conduct of plaintiff's supervisors was a pretext to mask their discriminatory intentions. He has failed to explain why the 715-page transcript from the fact-finding conference, at which pretext was heavily discussed, is insufficient. In any event, the issue of pretext is not relevant, because, as I conclude, plaintiff cannot establish an adverse employment action. *See Amirmokri*, 437 F. Supp. 2d at 420 ("The law is clear that to prevail on either [a discrimination or retaliation] theory of recovery, Plaintiff must first establish that he suffered some adverse employment action.").

As to counsel's request for information about the chain of command within the Army, he claims this information is pertinent to whether she was terminated. However, information about the chain of command cannot alter the fact that, after her transfer, plaintiff retained the same employer, i.e., the Army at Fort Detrick. Nor is there any basis for plaintiff's counsel's request for the "sum and substance of COL McCall's discussion with JAG about Ms. Madock's request for reconsideration." Opp'n App'x 101. At the Fact Finding Conference, Colonel McCall

---

[22] In her Opposition, plaintiff objects because the voluminous material submitted by defendant was not authenticated, pursuant to FED. R. EVID. 902, by an affidavit or declaration. Yet, much of plaintiff's Appendix is duplicative of defendant's exhibits. Nevertheless, in connection with defendant's Reply, defendant filed various declarations authenticating defendant's exhibits. *See* Reply Exhs. 28-33. Moreover, the Army and the Department of Defense regulations, *see* Motion Exhs. 11, 27, do not require authentication under FED. R. EVID. 902.

testified that he did not speak with JAG. Rather, Ms. Merriman told him to "terminate" plaintiff's administrative appeal requesting reconsideration of her performance appraisal, based on a conversation *she* had with JAG. Motion Exh. 1, at 293.

In sum, given the extensive record in this case, I am readily satisfied that there is no merit to plaintiff's request for further discovery. I will also construe the Motion as one for summary judgment. *See, e.g.*, *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998) (holding that a district court's conversion of a motion to dismiss into one for summary judgment, under similar circumstances, was not an abuse of discretion).

Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former FED. R. CIV. P. 56(c)). When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet this burden, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In resolving a summary judgment motion, the court must view the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-

moving party. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587; *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

## II. Statutory Scheme

Plaintiff has brought suit under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, which governs disability discrimination in federal employment. Although the Rehabilitation Act does not expressly provide for a private right of action, it is well established that private parties may sue to enforce it. *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Se. Cmty. Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979).

The standards used to determine whether a federal employer has discriminated under the Rehabilitation Act are those set forth under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* The Rehabilitation Act incorporates the ADA's anti-retaliation provision. *See* 42 U.S.C. § 12203(a). Thus, in addition to protecting federal employees against

discrimination on the basis of disability, the Rehabilitation Act bars retaliation against employees who have "opposed any act or practice made unlawful by [the ADA or the Rehabilitation Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a).

To establish discrimination under the Rehabilitation Act, based on her medical disability, plaintiff must show that: (1) she is disabled; (2) she was otherwise qualified for the employment in question; and (3) she suffered an adverse employment action on the basis of the disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005);[23]

---

[23] In ¶ 3 of her Amended Complaint, plaintiff asserts: "This court has jurisdiction under 29 U.S.C. § 791 and § 794(a)" (§ 501 and § 504 of the Rehabilitation Act, respectively). Curiously, in a subsequent submission (ECF 30), filed July 21, 2011, plaintiff states: "Ms. Madock sued under 29 U.S.C. § 791 (not 794)."

Section 504 (29 U.S.C. § 794) prohibits programs and activities that receive federal funds from discriminating against an individual "solely by reason of" that individual's disability. In contrast, § 501 (29 U.S.C. § 791) requires federal agencies to implement programs to facilitate the hiring, placement, and advancement of disabled individuals. Although it does not expressly prohibit disability discrimination by the federal government, the Supreme Court has interpreted it as doing so. *See Lane v. Pena*, 518 U.S. 187, 193 (1996).

But, it is far from settled whether § 501 is the exclusive avenue for employment discrimination claims brought by federal employees. *See Figueroa v. Geithner*, 711 F. Supp. 2d 562, 569 n.7 (D. Md. 2010). The Fourth Circuit has assumed, without deciding, that a disabled federal employee can bring suit against a federal agency under both § 504 (29 U.S.C. § 794) and § 501 (29 U.S.C. § 791) of the Rehabilitation Act. *See Little v. Fed. Bureau Investigation*, 1 F.3d 255 (4th Cir. 1993); *see also Nasiatka v. Johnson*, No. RDB-03-900, 2003 U.S. Dist. LEXIS 27125, at *17 (D. Md. Oct. 9, 2003) (suit against the Secretary of the Navy under § 501 and § 504).

It is also "far from settled" whether § 501 and § 504 employ the same standard in evaluating causation. *Dank v. Shinseki*, 374 F. App'x 396, 399 (4th Cir. 2010) (unpublished). On the one hand, § 504's causation standard provides: "No otherwise qualified individual with a disability . . . shall, *solely by reason of* her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . ." 29 U.S.C. § 794(a) (emphasis added). On the other hand, as noted, § 501 has no express prohibition on discrimination. Rather, 29 U.S.C. § 791(g) states, in part:

*see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (2001) ("[T]he general rule is that no covered entity shall discriminate against a qualified individual with a disability because of the disability.").

### III.  Methods of Proof

In general, there are "two avenues" at trial by which a plaintiff may prove intentional employment discrimination or retaliation. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997).  "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient

---

(...footnote continued)

> The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

Thus, under the plain reading of the statute, § 501 incorporates the ADA standard for causation.  But, the ADA's standard for causation is more lenient than that of § 504, in that the "solely by reason of" limitation does not apply.  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999).  The significance, if any, to a federal employee's decision to proceed under § 501 or § 504 is that different standards of causation may apply.  Here, in the supplemental filings, the parties dispute the appropriate standard.  *See* Deft. Supp. 2 (employing the "solely by reason of" standard); Pl. Supp. 2 (disputing same); Deft. Supp. Reply 4 ("[T]he United States maintains that the 'solely' standard applies to disability discrimination asserted by federal employees.  The Court need not resolve the applicable standard in the present case, however, because the plaintiff did not suffer intentional discrimination under any standard.").

In the Court's view, the resolution of plaintiff's Rehabilitation Act claim does not turn on which causation standard applies.  Thus, the Court need not decide whether plaintiff has, in fact filed suit under both § 501 and § 504, or merely under § 501.

probative force to reflect a genuine issue of material fact.'"  *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (citations omitted) (internal quotation marks omitted), *cert. denied*, 535 U.S. 933 (2002).

Where the plaintiff has not presented any direct evidence of discrimination or retaliation, the burden-shifting approach under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.[24]  *See Laber v. Harvey*, 348 F.3d 404, 432 (4th Cir. 2006).  Under what is popularly known as the *McDonnell Douglas* proof scheme, the plaintiff must first establish a "prima facie case" of discrimination or retaliation.  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination" or retaliation.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).[25]

---

[24] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964.  However, the burden-shifting methodology it endorsed has been adapted for use in cases of disability discrimination.  *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003) (applying *McDonnell Douglas* framework to claim of disability discrimination in employment under ADA); *Hooven-Lewis*, *supra*, 249 F.3d at 266-68 (applying *McDonnell Douglas* framework to federal employee's claim of disability discrimination in employment under the Rehabilitation Act).

[25] In *McDonnell Douglas,* the prima facie case of racial discrimination in hiring was formulated as follows, 411 U.S. at 802:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

The purpose of the prima facie case requirement is to assist the plaintiff in surmounting two common "evidentiary obstacles": (1) "'direct evidence . . . is likely to be unavailable'"; and (2) "'the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote'" the employee. *Smith v. Univ. of N.C. at Chapel Hill*, 632 F.2d 316, 334 (4th Cir. 1980) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("[T]he entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.").

The *McDonnell Douglas* proof scheme was created to resolve "the proper order and nature of proof" of discrimination or retaliation at trial, in the absence of direct evidence. *McDonnell Douglas*, 411 U.S. at 793; *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (stating that the *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production" (emphasis omitted)). The plaintiff is not required to present direct evidence of discriminatory or retaliatory intent in the prima facie case, nor is the plaintiff required to "exclude every hypothetical reason for the defendant's action toward him." *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 643 (4th Cir. 1978), *cert. denied*, 440 U.S. 981 (1979). Of course, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination" or retaliation. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff establishes a prima facie case, by a preponderance of the evidence, "a presumption of illegal discrimination [or retaliation] arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory [or non-retaliatory] reason

for its adverse employment action. *Hoyle v. Freightliner, LLC*, ___ F.3d ___, No. 09-2024, 2011 WL 1206658, at *11 (4th Cir. Apr. 1, 2011). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. Put another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory or non-retaliatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

When the defendant meets its burden, the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination" or retaliation. *Burdine*, 450 U.S. at 256. Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination or retaliation. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Conversely, if a plaintiff proves a prima facie case, and the defendant submits no evidence of any legitimate basis for its actions, the court or fact finder may "infer discriminatory [or retaliatory] animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). If the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the

conclusion that there was a nondiscriminatory [or non-retaliatory] reason for the adverse action," and the plaintiff has proved a prima facie case, "the court must award judgment to the plaintiff as a matter of law," *St. Mary's Honor Ctr.*, 509 U.S. at 509. This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3.[26]

## IV. Disability Discrimination

Referring to the elements of a claim under the Rehabilitation Act, discussed *supra*, defendant does not dispute that plaintiff has a medical disability (MS) and is an "otherwise qualified" individual. Therefore, I will proceed to the question of whether plaintiff has shown that she suffered an adverse employment action. It is this issue that the parties rigorously debate.

In her Amended Complaint, plaintiff alleges that the following acts constituted discriminatory, adverse employment actions *because* of her MS: the referral to the EAP (¶ 17); the circumstances of her negative performance appraisal (¶ 25); and the addition of SIP as a

---

[26] In *St. Mary's Honor Center*, the Supreme Court concluded that, where the employer meets its burden of producing evidence of legitimate reasons for its adverse action, but the fact-finder disbelieves all of the employer's proffered reasons, judgment for the plaintiff is permitted, but not mandatory, in that situation. The Court explained:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, "[n]o additional proof of discrimination is *required*. . . ." But . . . holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle . . . that a presumption does not shift the burden of proof, and ignores our repeated admonition that the . . . plaintiff at all times bears the "ultimate burden of persuasion."

509 U.S. at 511 (footnote omitted) (citations omitted).

requirement for her position, which she further alleges amounted to an actual or constructive discharge (¶¶ 27-28).[27]

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (alteration in original) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.), *cert. denied*, 543 U.S. 959 (2004)), *cert. denied*, 552 U.S. 1102 (2008). Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James*, 368 F.3d at 376.

Both actual and constructive discharge are considered adverse employment actions. *See, e.g., James*, 368 F.3d at 378.[28] In addition, "conduct 'short of ultimate employment decisions can constitute adverse employment action', [but] there . . . must be a 'tangible effect on the terms and conditions of employment.'" *Geist v. Gill/Kardash P'ship, LLC*, 671 F. Supp. 2d 729, 737 n.6 (D. Md. 2009) (quoting *James*, 368 F.3d at 371, 377). However, reprimands, warnings, and poor performance evaluations, by themselves, ordinarily do *not* to rise to the level of an adverse employment action. *See Amirmokri*, *supra*, 437 F. Supp. 2d at 423 (letter of reprimand not adverse employment action); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) ("Like a reprimand, a poor performance rating does not in itself constitute an adverse

---

[27] Although most of the argument focuses on the change in plaintiff's job description, the EAP referral and plaintiff's negative performance review are mentioned in the "Disability Discrimination" section of plaintiff's Amended Complaint. I will evaluate separately the various incidents alleged in the Amended Complaint (i.e., the EAP referral; the performance appraisal, and the SIP requirement).

[28] The concepts of "actual discharge" and "constructive discharge" are discussed, *infra.*

employment action. 'Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.) becomes relevant evidence.'" (citations omitted)). The salient "question is whether there was a change in the terms or conditions of [the plaintiff's] employment which had a 'significant detrimental effect' on [her] opportunities for promotion or professional development." *James*, 368 F.3d at 376 (quoting *Boone*, 178 F.3d at 256); *see, e.g., Prince-Garrison v. Md. Dep't of Health & Mental Hygiene*, 317 F. App'x 351, 353 (4th Cir. 2009) (unpublished) ("The other actions complained of by [the employees], such as her employer's failure to provide her with office supplies, reprimands for insubordination, meetings with supervisors, and directions to attend counseling, do not constitute adverse employment actions."); *Toulan v. DAP Prods.*, No. CCB-05-2254, 2007 U.S. Dist. LEXIS 4087, at *14 (D. Md. Jan. 17, 2007) (noting that attendance warning and negative performance evaluation, although causing "subjective discomfort," did not "result[] in a tangible consequence to any aspect of [plaintiff's] career"), *aff'd*, 271 F. App'x 312 (4th Cir. 2008); *Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 706 (D. Md. 2003) ("Plaintiff's low performance evaluations, reprimands, and counseling and communication card entries did not affect the terms, conditions, or benefits of her employment. . . . Plaintiff lost no pay and maintained the same position . . . ." (citations omitted)).[29]

---

[29]*Toulan*, *Jeffers*, and *Allen* involved retaliation claims, which also require an adverse employment action. As will be discussed, *infra*, the standard for an adverse employment action in a retaliation claim is less onerous than the standard in a discrimination claim. *Toulan*, 2007 U.S. Dist. LEXIS 4087, at *26; *accord Grice v. Balt. Cnty., Md.*, No. JFM 07-1701, 2008 U.S. Dist. LEXIS 91114, at *22 (D. Md. Nov. 5, 2008) ("The Supreme Court recently explained that the standard for showing an adverse employment action in the retaliation context is less strenuous than in the substantive discrimination context."), *aff'd*, 354 F. App'x 742 (4th Cir. 2009). It follows that if a challenged action does not satisfy the retaliation standard, it will not meet the standard for discrimination.

As indicated, "[a] 'downgrade of a performance evaluation *could* effect [sic] a term, condition, or benefit of employment' if it has a tangible effect on the terms or conditions of employment." *James*, 368 F.3d at 377 (quoting *Von Guten v. Maryland*, 243 F.3d 858, 867 (4th Cir. 2001)). Therefore, a performance evaluation will be actionable "'where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *James*, 368 F.3d at 377 (quoting *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)). However, a poor performance evaluation that "merely caus[es] a loss of prestige or status" is not actionable. *James*, 368 F.3d at 377.

*Plaintiff's Referral to the EAP*

Plaintiff contends that Colonel McCall "accused Ms. Madock of being a suicide risk because of his prejudice against people with MS." Opp'n 4. It is evident, however, that the meeting at which Major Jorgensen and Colonel McCall discussed EAP counseling with plaintiff did not constitute an adverse employment action. The matter may have embarrassed, angered, or offended plaintiff, but it did not have any tangible effect on the terms, conditions, or benefits of her employment. Neither Colonel McCall's alleged curtness nor plaintiff's speculation that the matter was inspired by a secret desire on McCall's part to remove her from her position can be characterized as an adverse employment action.

*Plaintiff's Performance Appraisal*

Plaintiff contends that her performance appraisal of "C," and the circumstances surrounding that appraisal, constituted occasions in which her supervisors, Colonel McCall and Major Jorgensen, discriminated against her because of her MS. *See* Am. Compl. ¶ 5 ("COL McCall and MAJ Jorgensen compromised by giving Ms. Madock a 'C' with no pay raise, a

written warning, and by changing her job description to require SIP so she would be forced out."); *see also* Opp'n 21 ("Ms. Madock's evidence will show her alleged performance failures were similarly contrived by management to justify disability discrimination.").  Further, she claims that her  performance rating of "C" caused the loss of a pay raise that plaintiff would have obtained had she received a "B" rating.  Opp'n App'x 3.  In her Declaration, submitted by plaintiff in the Appendix to her Opposition, she avers:  "The appraisal notified me I would not receive a pay raise which I would have received with a 'B.'"  Opp'n App'x 3.  However, there is nothing in the record that indicates that plaintiff's performance evaluation was, in fact, linked to a negative action with regard to her salary.[30]  Nor has plaintiff attempted to explain the manner in which pay raises were awarded.

Plaintiff's exhibits include the Laboratory Personnel Management Demonstration Project (the "Demonstration Project"), 63 Fed. Reg. 10440 (Mar. 3, 1998), which was implemented by the Office of Personnel Management "to achieve the best workforce for the Medical Research & Materiel Command (MRMC) mission, adjust the workforce for change, and improve workforce quality" at Fort Detrick.  *See* Opp'n App'x 104-27.[31]  Relevant to this case, the Demonstration Project sets forth guidelines linking performance to pay and "simplifying paperwork and the processing of classification and other personnel actions."  *Id.* at 10443.

---

[30] The performance appraisal indicated that plaintiff would receive "0" increase or bonus. *See* Opp'n App'x 38.  Plaintiff's prior performance appraisals, with one exception, left that section blank.  Moreover, the appraisal itself does not indicate that, if plaintiff had received a "B," she would have obtained a pay raise or a bonus.

[31] The parties have not discussed the Demonstration Project in the context of pay raises, but the Court has endeavored to glean the process from the exhibits.  The Demonstration Project is just over fifteen pages of three-columned, single-spaced text.

The Demonstration Project indicates that covered employees, such as plaintiff, are categorized into "discrete pay bands (levels) corresponding to recognized advancement within the occupations." *Id.* at 10445. "Each occupational family will be divided into three to five pay bands," each of which covers a salary range.[32] *Id.* Plaintiff's position description, *see* Motion Exh. 19 (*also available at* Opp'n App'x 62-65), and the personnel file relating to her reassignment, *see* Motion Exh. 23 (*also available at* Opp'n App'x 85), reflect that, as a Medical Technologist, plaintiff's "occupational family" was that of "Engineers & Scientists." *See also* 63 Fed. Reg. 10446. According to the Demonstration Project, the Engineers & Scientists occupational family has five pay bands. 63 Fed. Reg. 10446. Plaintiff's Medical Technologist position was in pay band II. *See* Motion Exhs. 19, 23.[33]

In addition to streamlining compensation categories, the Demonstration Project also addresses promotions. "A promotion is the movement of an employee to a higher pay band within the same occupational family or to a pay band in a different occupational family which results in an increase in the employee's salary." 63 Fed. Reg. 14446. Notably, "[p]romotions will be processed under competitive procedures in accordance with merit principles and requirements." *Id.* "To be promoted competitively or noncompetitively from one band to the next, an employee must meet the minimum qualifications for the job and have a current performance rating of 'B' or better . . . ." *Id.* at 10447.

---

[32] At the time of the Demonstration Project's implementation, salaries were categorized into "grades." *Id.* at 10445. The various "pay bands" implemented by the Demonstration Project "cover[ed] the same pay range [at the time] covered by one or more grades." *Id.* The Demonstration Project further indicated that "[a] salary overlap, similar to the current overlap between GS grades, [would] be maintained." *Id.*

[33] Pay band II, within the Engineers & Scientists occupational family, has a salary range that corresponds to GS grades 5 – 12. 63 Fed. Reg. 10446.

The Demonstration Project also provides for upward movement *within* a pay band's salary range. However, such an upward salary adjustment is "not considered" a promotion. *Id.* at 14446. "Progression within a pay band is based upon performance pay increases." *Id.* In turn, performance pay increases are dependent on the performance appraisal process, and the Demonstration Project establishes the various weighted elements (e.g., technical competence, working relationships, communications) that make up a performance appraisal score. *Id.* at 10460-61. It provides that employees receiving a score of "B" or higher "will be eligible to receive performance-based pay increases and/or bonuses"; employees rated "C" or higher will receive an annual general increase (also referred to as the "cost-of-living allowance"); and employees rated "F" will not receive the general increase. *Id.* at 10440, 10448.

Of particular import to this case, plaintiff's reassignment personnel file states that she was "*at the full performance level or band*" at the time of her reassignment. Motion Exh. 23 (emphasis added). Thus, at the time of her transfer, it appears that plaintiff had reached the maximum level of pay in what was then her pay band. She has not shown that she was entitled to be promoted to a higher pay band as long as she remained a Medical Technologist.[34] *See Allen, supra*, 273 F. Supp. 2d at 706 ("Even though Plaintiff's . . . performance evaluation resulted in Plaintiff falling in the 'not promotable' range, there is no evidence that a promotion arose for which Plaintiff was passed over because of her 'not promotable' status."). To the extent that plaintiff was entitled to *any* "raise," it was the "annual general increase," which the Demonstration Project provides she would have been entitled to receive even with a "C" rating.

---

[34] As I have set forth in the facts, plaintiff's performance evaluations, *see* Opp'n App'x 23-31, generally do not indicate (with one exception in 2004) that she ever received a performance-based pay increase.

*Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388 (D. Md. 2004), *aff'd*, 183 F. App'x 387 (4th Cir. 2006), is instructive. There, an employee alleging race discrimination had received a poor performance evaluation, and claimed that it resulted in his ineligibility for a pay raise. *Id.* at 395 & n.3. The court noted that plaintiff had shown no evidence, other than his own affidavit, of any ineligibility for "an annual salary increase or bonus" as a result of the performance review. *Id.* at 395 n.3. Judge Titus said: "A performance review which has no effect on Plaintiff's compensation or promotion cannot be considered an adverse employment action." *Id.* at 395. Concluding, *inter alia*, that "[n]either the poor evaluation rating, nor the placement on a [Performance Improvement Plan] constitute adverse employment actions," the court granted summary judgment to the defendant. *Id.* at 394.

In another summary judgment case, *Jackson v. Maryland*, 171 F. Supp. 2d 532 (D. Md. 2001), the court considered a retaliation claim in which the alleged adverse employment action was a poor performance evaluation that "denied [plaintiff] a promotion and an accompanying raise." *Id.* at 545. Judge Motz stated: "[A] poor evaluation by itself, even one that seems suspicious due to its departure from previous evaluations, is not an adverse action that establishes a prima facie case of retaliation, and there is nothing in the record that indicates that this performance evaluation was linked to a missed opportunity for promotion." *Id.* (citation omitted).

This case is akin to *Pulley* and *Jackson.* Plaintiff has not provided any evidence that she did not receive the "annual general increase," nor has she provided any evidence, besides her bald assertion in her Declaration, *see* Opp'n App'x 3, that, but for her appraisal grade of "C," she would have received a performance-based pay increase. And, the evidence that she *has*

provided, such as the Demonstration Project, *see* Opp'n App'x 104-27, and the update to her personnel file upon her reassignment, *see id.* at 85, seem to indicate that plaintiff had reached the maximum level of pay in her band, and therefore was not entitled to *any* performance-based raise, regardless of her grade on the performance appraisal. Rather, she was eligible for the "annual general increase," even with a grade of "C." Put simply, there is nothing in the record to suggest that plaintiff's poor performance appraisal was used "'as a basis to detrimentally alter the terms or conditions of [her] employment.'" *James*, 368 F.3d at 378 (citation omitted). It follows that plaintiff's performance appraisal did not amount to an adverse employment action, and thus cannot form the basis of a discrimination claim.

### The Change in Job Description

As noted, plaintiff avers that the addition of SIP to her job description was fueled by discriminatory intent and constituted a constructive or actual discharge, i.e., an adverse employment action. Am. Compl. ¶ 27. Defendant contends that plaintiff did not suffer an adverse employment action, because she was neither constructively nor actually discharged. To the contrary, asserts defendant, Madock remains an Army employee.

As to the claim of actual discharge, defendant asserts that such a claim must fail, because "plaintiff admits in her complaint that she never left employment with the Army." Deft. Supp. 3. Defendant points out that plaintiff "remained in her position as a Medical Technologist for nearly eight months until she accepted a reassignment to a Quality Assurance Scientist position, with no loss of pay or grade." Reply in Support of Motion to Dismiss or in the Alternative, for Summary Judgment ("Reply," ECF 25) 2. Thus, defendant insists that plaintiff has failed to show that her "reassignment had any detrimental effect." *Id.* at 3.

With regard to plaintiff's claim of constructive discharge, defendant asserts that plaintiff has not shown that a reasonable person in her position would have felt compelled to resign, i.e., that the working conditions were objectively intolerable. Motion Memo. 19; Reply 7. Rather, "[a]fter it was confirmed that the plaintiff was medically ineligible to participate in SIP, the Army notified her that it would provide a reassignment as a reasonable accommodation." Reply 8. Defendant contends that plaintiff's reassignment, with no loss in grade or pay, is not actionable. *Id.*; Motion Memo. 20.

In addition, defendant contends that plaintiff has not shown any deliberate attempt by defendant to force plaintiff to quit, nor has she shown that the SIP requirement was pretextual. Reply 4; Motion Memo. 18; Deft. Supp. Reply 5. Defendant explains that the SIP change was instituted for reasons unrelated to plaintiff, i.e., a concern as to vulnerability in the mission, which Major Jorgensen had recognized a year prior to implementing the SIP requirement. Reply 6. Noting that the Army did not single out plaintiff with regard to the SIP requirement, defendant points out that SIP was a universal requirement for all of the civilians working in the Clinical Lab. Reply 4; *see* Motion Exh. 1, at 269 (As noted, plaintiff testified: "In relation [t]o the SIP, I would say no, no one was treated differently.").[35] Moreover, defendant contends that the Army went to great lengths to retain plaintiff, through reasonable accommodations. Motion Memo. 19.

---

[35] Curiously, despite this testimony, plaintiff argues in her Opposition: "[W]hen MAJ Jorgensen changed job descriptions on August 6, 2009 to require SIP, Ms. Madock was the *only* person affected." Pl. Supp. 4. Defendant observes, correctly, that plaintiff's own admissions are binding. Deft. Supp. Reply 5 (citing *Lightner v. City of Wilmington*, 545 F.3d 260, 264 (4th Cir. 2008)).

In response, plaintiff asserts that she has adequately shown an adverse employment action. Opp'n 12. She contends: "If requiring Ms. Madock to participate in SIP was not clear enough for actual discharge it was certainly 'constructive discharge.[']" *Id.* at 16. In her view, the addition of SIP to her position description had the effect of terminating her, and "[t]he fact that the Army took steps to limit the harm . . . does not change the fact that it fired Ms. Madock in August, 2009." *Id.* at 13. Plaintiff argues, *id.* at 20:

> If quitting is an element of constructive discharge, Ms. Madock arguably quit. She began looking for another job. When she found [the new job] she told her bosses she was leaving. If she had gone to work for Frederick Memorial Hospital, there would be no question that she quit. The Army argues that because she found a job in another Army unit she did not quit.

With regard to deliberateness in forcing plaintiff out of her position, plaintiff contends that the change in position requirements, adding SIP, was made for the purpose of disqualifying plaintiff from her position. *Id.* at 18. According to plaintiff, the timing of Major Jorgensen's decision to change the Medical Technologist position description suggests deliberateness, and it is of no moment that Major Jorgensen did not use the words, "You're fired." *Id.*

Finally, plaintiff disagrees with defendant's assertion that a reasonable person would not have felt compelled to resign. She asserts that the SIP requirement was tantamount to asking her to do the impossible, i.e., receive injections that might harm or kill her. *Id.* at 19. Claiming that such conditions were intolerable, she argues: "MAJ Jorgensen might as well have asked Ms. Madock to tie feathers to her arms and fly around the base." *Id.*

At this juncture, it is helpful to review briefly the pertinent facts as to the SIP requirement.

As discussed previously, Major Jorgensen joined the Clinical Lab on September 1, 2008. Motion Exh. 1, at 114-15. Upon her arrival, Larry Sullivan, a civilian "Medical Technician," was the only person who was able to work in Biosafety Level 3 and 4 containment. *Id.* at 156-57. Linda Hildebrand and the plaintiff, both of whom were Medical Technologists, were not required to do so. *Id.* at 156-57; *see also id.* at 319. Because Sullivan was the only civilian employee who was eligible to work in the containment suites, he sometimes had to work successive weekends. *Id.* at 157, 318-19.

Jorgensen was "extremely concerned" that only one civilian employee was able to work in the ICU. *Id.* at 174 (Jorgensen testified: "[W]e would have to be observing a patient [in quarantine] for up to 21 days, and Larry [Sullivan] couldn't do it by himself."). Indeed, Jorgensen testified that she "did lose a lot of sleep" over the deficiency in staff. *Id.* at 154. In her view, it was necessary for all the staff members to enroll in SIP and BPRP so that they would be eligible to support the ICU. *Id.* at 158-59, 174. Further, Jorgensen found that Hildebrand's position description required her to be enrolled in SIP, whereas plaintiff's position description, stating "immunizations required," apparently did not include SIP.[36] *Id.* at 155. In Major Jorgensen's view, because Hildebrand and the plaintiff were both Medical Technologists at the same level, their position descriptions should have been identical. *Id.* For these reasons, Major Jorgensen revised the position descriptions of her civilian employees so that they *all* included the SIP enrollment requirement. *Id.* at 158-59.

---

[36] Major Jorgensen testified: "I started asking . . . what does 'immunizations required' mean? Does that mean special immunizations?" Motion Exh. 1, at 155. As noted, it is undisputed that SIP was not a job requirement for plaintiff until 2009, when the change in position description was adopted.

On August 6, 2009, Major Jorgensen informed the plaintiff and other civilian employees of the revised position requirements, which became effective on September 4, 2009. Motion Exh. 18; *see also* Motion Exh. 1 at 209-10; Motion Exh. 19. Major Jorgensen also directed Hildebrand to re-enroll in SIP. Motion Exh. 1, at 158. Because of her MS, however, plaintiff was medically ineligible to participate in SIP.

As noted, an employee may prove an adverse employment action by showing actual or constructive discharge. No specific words or acts are required in order to show an actual discharge, however. Thus, an employer does not need to use the words "fired," "discharged," or "terminated" in order for a plaintiff to establish a discharge. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004); *EEOC v. Serv. News Co.*, 898 F.2d 958, 962 (4th Cir. 1990). Rather, "an actual discharge occurs when the employer, by words or acts, manifests a clear intention to dispense with an employee's services." *Payne v. Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977); *accord EEOC v. Marion Motel Assoc.*, No. 91-2070, 1992 U.S. App. LEXIS 9589, at *13 (4th Cir. May 5, 1992) (unpublished). But, "a plaintiff may not resign and later claim he was actually discharged if he did not think at the time of his resignation that his termination was inevitable." *Alba v. Merrill Lynch & Co.*, 198 F. App'x 288, 293 n.3 (4th Cir. 2006) (unpublished) (citing *Serv. News Co.*, 898 F.2d at 960-62).

It is clear that plaintiff was not actually discharged. To be sure, the Miller letter acknowledged the "possibility" of her termination. Opp'n App'x 79. However, no termination ever occurred; the record reflects that Madock continued to work as a Medical Technologist, despite the August 2009 change in the position description, requiring enrollment in SIP. She remained in that position for more than seven months, until she found a suitable reassignment.

In her Opposition, at 13, plaintiff admits: "Despite being fired, Ms. Madock continued to work for USAMRIID as a Medical Technologist . . . ."

The question remains whether the circumstances of plaintiff's reassignment to the position of Quality Assurance Scientist constituted an adverse employment action, such as a constructive discharge. As indicated, reassignments may, in some circumstances, amount to adverse employment actions. In the case of a reassignment, the plaintiff must "'show that the reassignment had some significant detrimental effect.'" *James*, 368 F.3d at 376 (quoting *Boone*, *supra*, 178 F.3d at 256). But, "'[t]he mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action.'" *Holland*, 487 F.3d at 219 (quoting *James*, 368 F.3d at 376). "'Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.'" *James*, 368 F.3d at 376 (quoting *Boone*, 178 F.3d at 256-67); *see also Edmonson v. Potter*, 118 F. App'x 726, 729 (4th Cir. 2004) ("A transfer in duties or reassignment that does not result in any decrease in salary, benefits, or rank cannot constitute an adverse employment action necessary to state a prima facie case of discrimination.").

"A constructive discharge involves both an employee's decision to leave and precipitating conduct . . . ." *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004). "To establish constructive discharge, a plaintiff must be able to show that [her] former employer 'deliberately made an employee's working conditions intolerable, and thereby forced [her] to quit.'" *James*, 368 F.3d at 378); *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 574 (4th Cir. 2000) ("To

advance a claim for 'constructive discharge,' the plaintiff must establish: (1) the employer deliberately made an effort to force the employee to quit; and (2) that the working conditions were intolerable." (citing *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 244 (4th Cir. 1997), *cert. denied*, 522 U.S. 1116 (1998)); *see also Lyons v. Peake*, No. WDQ-08-2532, 2009 U.S. Dist. LEXIS 69894, at *10 (D. Md. Aug. 19, 2009) (holding no constructive discharge where plaintiff was fired and did not resign on his own). "Plaintiff must therefore demonstrate: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." *Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 262 (4th Cir.), *cert. denied*, 548 U.S. 941 (2006); *see Honor*, 383 F.3d at 186-87.

With regard to tolerability, courts look objectively at the working conditions. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001); *see Heiko*, 434 F.3d at 262 ("Whether an employment environment is intolerable is determined from the objective perspective of a reasonable person."). For instance, "mere 'dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" *James*, 368 F.3d at 378 (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)); *accord Heiko*, 434 F.3d at 262; *see Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). "Even a 'slight decrease in pay coupled with some loss of supervisory responsibilities, is insufficient evidence of constructive discharge.'" *James*, 368 F.3d at 378 (quoting *Carter*, 33 F.3d at 459)).

With regard to deliberateness, "[a]n employer's actions are deliberate only if they 'were intended by the employer as an effort to force the plaintiff to quit.'" *Heiko*, 434 F.3d at 262 (quoting *Matvia*, 259 F.3d at 272). "Where, however, all employees are treated identically, no

particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign." *EEOC v. Clay Printing Co.*, 955 F.2d 936, 944 (4th Cir. 1992) (citation omitted).

The Fourth Circuit has recognized that the "traditional standard of constructive discharge . . . does not neatly translate to the context of the Rehabilitation Act." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993), *cert. denied*, 513 U.S. 806 (1994). This is because "the Rehabilitation Act demands more of the federal government than simple equality of treatment--the government must affirmatively take steps to accommodate employees with handicaps, unless accommodation would impose undue hardship on the government." *Id.* That is to say, "[t]reating disabled workers the same as workers without a disability falls short of satisfying the requirements of the Rehabilitation Act." *Id.* In effect, "[t]his duty of affirmative accommodation complicates the application of a standard requiring evidence of differential treatment to establish deliberate intent to discharge." *Id.*

Thus, a "complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Id.* at 132. But, not every claim of failure to accommodate constitutes a claim for constructive discharge. *Id.* at 131. Rather, the plaintiff must still "present some evidence that the employer intentionally sought to drive her from her position." *Id.* at 132. Notably, a mere "lack of flexibility or magnanimity on the part of . . . supervisors," without more, does not translate to "deliberate intent." *Id.*

In *Bennett v. Charles County Public Schools*, No. AW-04-1501, 2006 U.S. Dist. LEXIS 96719 (D. Md. May 23, 2006) (unpublished), *aff'd*, 223 F. App'x 203 (4th Cir. 2007), the

plaintiff was notified that his position would be eliminated due to the closing of the facility at which he was employed. *Id.* at *2. The plaintiff obtained a transfer, but to a position below his qualifications. *Id.* Unhappy with his reassignment, the plaintiff brought a race discrimination case based on his removal (and demotion) from his original position. *Id.* at *3.

In the context of the defendant's motion for summary judgment, the court rejected the plaintiff's constructive discharge claim, "as a matter of law." *Id.* at *11. It reasoned, *id.* at *12:

> Here, the record shows that after Plaintiff was informed that the wastewater operator position would be eliminated, Plaintiff was permitted to remain in that position for over a year, and then transferred into the only open position for which he was qualified. . . . Upon his transfer, Plaintiff was guaranteed to receive his old salary for a period of two years. In addition, Defendant accommodated Plaintiff's request to adjust the hours of his shift. Thus, rather than attempting to force Plaintiff to resign, it appears that Defendant was making every effort to retain Plaintiff as an employee.

Here, the record is replete with evidence that, prior to the change in plaintiff's job description, the Army made multiple accommodations for plaintiff's benefit. For example, the Army provided plaintiff with a scooter; installed handicap accessible push buttons at areas of egress; removed her from phlebotomy duties, upon her request; installed handrails along the hallway; and provided her with time for physical therapy.

It is true that the change in the position description for Medical Technologist meant that Madock was no longer qualified for that position. But, as noted, after the SIP requirement was adopted, Madock continued to work at the Clinical Lab, while Human Resources searched for a new position within the parameters that plaintiff established.[37] Plaintiff eventually transferred to a new position, Quality Assurance Scientist, on terms that did not differ materially from her prior

---

[37] Apart from plaintiff's assertion that she believes that the position was open to other candidates and that she had to apply for it, Opp'n App'x 7, there is no proof that plaintiff actually had to compete for the position.

position. To the contrary, plaintiff's new position pays the exact same salary ($85,060.00) as her prior position. Motion Exh. 23. She is also at the same grade/level (02), and has the same pay plan (DB) and pay basis (PA) as she had in her former position as a Medical Technologist. *Id.* Given the circumstances of plaintiff's reassignment, coupled with the multiple accommodations the Army made for plaintiff prior to the change in job description, it is evident that the Army made "every effort to retain" plaintiff as an employee, with the same status. *Bennett*, 2006 U.S. Dist. LEXIS 96719, at *12.

Put simply, neither the circumstances leading to plaintiff's reassignment nor the actual reassignment constitute an actual or constructive discharge, or an adverse employment action. Because plaintiff cannot establish a prima facie case of employment discrimination on the basis of disability, the Court will grant summary judgment to the defendant on this claim.[38]

## IV.

In addition to her claim of discrimination, plaintiff alleges that Colonel McCall's "refusal to act" on the appeal of her performance appraisal constituted retaliation for her filing of an EEO complaint. Am. Compl. ¶ 33.[39]

_____

[38] In the context of pretext and proving discriminatory animus, plaintiff has also discussed other incidents, such as Colonel McCall's statement, in his EEO Counselor Questionnaire, that plaintiff "should be medically retired," and his criticism of plaintiff's handling of HIV test results in the LIS. *See* Opp'n 6, 11. However, because plaintiff has not established a prima facie case, the Court need not examine these incidents as proof of pretext, nor does the Court need to evaluate the propriety of Major Jorgensen's decision to require all the civilian employees to participate in SIP. *See* Opp'n 18 (observing that the former Clinical Lab director did not believe it was necessary for all civilian employees to participate in SIP).

[39] As noted in the discussion of the facts, on August 19, 2009, plaintiff appealed her "C" rating via the performance appraisal reconsideration process. On November 25, 2009, Colonel McCall terminated her appeal, informing plaintiff that no further administrative action would be taken because plaintiff's performance appraisal was the subject of the EEO complaint that she filed on November 1, 2009.

The elements of a prima facie claim of retaliation under the Rehabilitation Act are: "'(1) plaintiff engaged in protected activity, such as filing an EEO complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action.'" *Hooven-Lewis*, *supra*, 249 F.3d at 274 (quoting *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)); *see Perry v. Computer Scis. Corp.*, No. 10-2195, 2011 U.S. App. LEXIS 9564, at *2-3 (4th Cir. 2011) (unpublished); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).

An EEO complaint need not be "formal" to qualify as "protected activity." *Hooven-Lewis*, 249 F.3d at 273. Rather, "informal contacts with the EEO and informal complaints are also protected activities if the accused person or entity knew about them." *Id.* In any event, the parties do not dispute that plaintiff's EEO complaint constituted protected activity.

Nevertheless, defendant contends: "The plaintiff cannot demonstrate that the suspended appeal was an adverse employment action. Under Army grievance rules, an employee may not litigate a grievance in more than one forum." Motion Memo. 22. In support of his position, defendant cites Exhibit 27 to the Motion, Department of Defense ("DoD") Policy "Subchapter 711: Administrative Grievance System" ("Subchapter 711" or "SC771"), dated December 1996. Relying on Exhibit 27, he asserts: "A deciding official may cancel or temporarily suspend a grievance if the employee raises the same matter under another formal dispute resolution process." *Id.* at 23. According to defendant, Colonel McCall's decision to suspend plaintiff's appeal of her performance appraisal complied with Subchapter 711. *Id.* Further, defendant asserts that suspension of the appeal would not "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

Plaintiff counters that the memorandum of November 25, 2009, in which Colonel McCall suspended her appeal, "admits" retaliation. Opp'n 25. Citing the Demonstration Project and other internal Army documents, she contends that Subchapter 771 was inapplicable, and that she was not limited to presenting her grievance in one forum. *Id.* at 25-26. Plaintiff asserts: "Reconsideration is a privilege of employment Ms. Madock was denied because of her discrimination charge." *Id.* at 27. Further, she argues: "Ms. Madock could not make her claim (that the 'C' Performance Evaluation did not match her written evaluation) in her EEO administrative proceeding." *Id.* at 26-27.

With her Opposition, plaintiff included the Army's Medical Research and Materiel Command "Personnel Demonstration Project Training Manual" (the "Training Manual"), dated March 2007. *See* Opp'n App'x 129. It provides a basic overview of the performance guidelines outlined in the Demonstration Project (discussed, *supra*). Relevant to the grievance process, the Training Manual provides, *id.* at 153 (italics added):

> Reconsideration Process: Employees who are dissatisfied with their performance appraisals and cannot resolve the problem informally may request formal reconsideration. The formal request for reconsideration should be submitted in the *form of a grievance*, first to the rater, then to the senior rater, then to the Commander/Director, and finally to the [Personnel Management Board] if necessary. Other existing grievance and appeal procedures may be used as necessary.

The Demonstration Project states: "Employees covered by the project will be evaluated under a performance evaluation system that affords grievance rights comparable to those currently. The [Medical Research & Materiel Command] will maintain the substantive and procedural appeal rights currently afforded when taking action for misconduct and poor performance." 63 Fed. Reg. 10440, 10449 (Mar. 3, 1998).

Plaintiff also relies on a document dated September 1999, known as "Policy No. 11," titled: "Laboratory Personnel Management Demonstration Project: Reconsideration Process" ("Policy 11").[40] Opp'n App'x 157. Policy 11 provides that, upon receiving a performance appraisal, an employee will "[a]ccept and sign performance rating as written," or "[c]ontest [the] rating," in which case the employee "may choose to follow the procedures outlined herein for reconsideration." *Id.* Policy 11 also outlines the steps and time frame for managerial responses that an employee can expect upon seeking reconsideration. *Id.*

Of import, Policy 11, the Training Manual, and the Demonstration Project do not explain the effect, if any, on an appeal of a performance appraisal that has also become the subject of an EEO complaint. As noted, the appeal or reconsideration process takes "the form of a grievance." *Id.* at 153.

Defendant has submitted Subchapter 771 from the DoD's "Civilian Personnel Management System" ("CPMS"). The CPMS is set forth in a multi-volume manual, and establishes policy and uniform procedures for civilian personnel management in the DoD, including the Army.[41] Subchapter 771 pertains to employee grievance rights.[42] Subchapter 771

---

[40] Policy 11 was enclosed with the Performance Memorandum of August 4, 2009, from Major Jorgensen to plaintiff.

[41] The CPMS is available online at http://www.dtic.mil/whs/directives/corres/html/CPM_table2.html

[42] Motion Exh. 27 sets forth the stated purpose of SC771:

This Subchapter establishes the Department of Defense (DoD) Administrative Grievance System (AGS) under 5 CFR 771 (reference (a)). It states DoD AGS policy under DoD Directive 1400.25 (reference (b)). It also assigns responsibilities and prescribes requirements for the DoD AGS under which DoD activities can internally review employee disputes involving working conditions within the control of DoD management. The DoD AGS applies to all DoD

provides that "[a]ny employment matter may be grieved under the [administrative grievance system]," except for several enumerated items, including the following:

> SC771.4.2.2.2.   Any matter covered by a negotiated grievance procedure or subject to formal review and adjudication by the Merit Systems Protection Board (MSPB), the Office of Personnel Management (OPM), the Federal Labor Relations Authority (FLRA), or the Equal Employment Opportunity Commission (EEOC); or any matter that the employee files under another review or reconsideration procedure, or dispute resolution process within the Department of Defense . . . .

Further, Subchapter 771 provides, in relevant part, *id.*:

> SC771.4.6.2.5.  Wherever possible, the deciding official should rule on the merits of a grievance.  However, the deciding official may cancel or temporarily suspend a grievance, or the appropriate portion of a grievance, if:

> * * *

> SC771.4.6.2.5.2.  The grievant or grievance is excluded from coverage;

> * * *

> SC771.4.6.2.5.5.   The grievant raises the same matters under another formal dispute resolution process.

As noted, *supra*, the standard to establish an adverse employment action in a retaliation claim is less "strenuous" than the standard in a discrimination claim.  *Toulan*, *supra*, 2007 U.S. Dist. LEXIS 4087, at *26.  The adverse employment action in a retaliation case need not affect an employee's "terms or conditions of employment."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 70 (2006).[43]  Rather, "a plaintiff must show that a reasonable employee would have

---

(...footnote continued)

> Components except the National Security Agency and the Defense Intelligence Agency.

[43]  The Court assumes, *arguendo,* that the less stringent *Burlington Northern* standard applies to claims brought by federal employees.  *See, e.g.*, *Pueschel v. Peters*, 340 F. App'x 858, 861 n.4 (4th Cir. 2009) (unpublished); *Wells v. Gates*, 336 F. App'x 378, 383 n.5 (4th Cir. 2009)

found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 67. To illustrate, the Supreme Court has described "[a] supervisor's refusal to invite an employee to lunch" as a trivial, non-materially adverse action, but has said that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement," is conduct that "might well" be materially adverse. *Id.* at 69.

Colonel McCall explicitly stated that he was suspending reconsideration of plaintiff's performance because of her EEO complaint. The record supports that the Army's actions were conducted in accordance with the Army's own policies, notably Subchapter 771, which appears to govern the circumstances of this case.[44] Thus, even assuming that McCall's decision amounted to a materially adverse action, defendant has demonstrated a legitimate, non-retaliatory reason for his actions.

Plaintiff has not challenged Subchapter 771 as a facially retaliatory policy.[45] Rather, she argues that it does not apply here. "An employer may enforce generally applicable employment

---

(...footnote continued)

(unpublished); *Moore v. Leavitt*, 258 F. App'x 585, 586 (4th Cir. 2007) (unpublished); *Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007); *Brockman v. Snow*, 217 F. App'x 201, 206 (4th Cir. 2007) (unpublished).

[44] To the extent that plaintiff suggests that the suspension deprived her of an opportunity to "argue that her review did not match her written evaluation in the Reconsideration Process," Opp'n 27, that assertion is disingenuous. Plaintiff's Formal Complaint of Discrimination clearly identified her 2009 performance appraisal and the Performance Memorandum. Motion Exh. 24. Construing her EEO charge liberally would suggest that the circumstances incident to the subsequent reconsideration process would also be investigated, and the record reflects that it was.

[45] Other courts have encountered similar policies in regard to other federal agencies. *See, e.g.*, *Ward v. Kempthorne*, No. 2:08CV1DAK, 2008 U.S. Dist. LEXIS 60881, at *6 (C.D. Utah

policies against its employees without creating a cause of action for retaliation." *Wells v. Gates*, 336 F. App'x 378, 385 (4th Cir. 2009) (unpublished) (collecting cases). Defendant's suspension of plaintiff's performance appraisal grievance, pursuant to Subchapter 771, was not actionable.

Accordingly, with regard to plaintiff's retaliation claim, the Court will grant summary judgment to the defendant.

A separate Order consistent with this Opinion will follow.


Date: <u>August 18, 2011</u>     <u>/s/       </u>
                Ellen Lipton Hollander
                United States District Judge

---

(...footnote continued)

Aug. 8, 2008) (Department of Interior policy); *Williams v. Sec'y of Navy*, 853 F. Supp. 66, 68 (E.D.N.Y. 1994) (Navy policy).